J-S34014-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| M.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| S.G. | : | |
| | : | |
| Appellant | : | No. 629 MDA 2020 |

Appeal from the Order Entered March 5, 2020
In the Court of Common Pleas of Luzerne County
Civil Division at No(s): 10899 of 2013

BEFORE: PANELLA, P.J., BENDER, P.J.E., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, P.J.: **FILED DECEMBER 15, 2020**

S.G. ("Mother") appeals from the March 5, 2020 order, which denied her request to relocate with the parties' minor child ("Child"), born in January of 2013, from Luzerne County to Lexington, Massachusetts. After careful review, we affirm.

Mother resides in the Pittston, Pennsylvania area. Father lives in Exeter, Pennsylvania. Mother is of Indian descent and Father is Caucasian. Child presently attends elementary school in the Pittston Area School District.

The parties met while both working at Schott Optical in Duryea, Pennsylvania. Mother and Father are the natural parents of Child, and were

unmarried at the time of his birth. The relationship between the parties remains unattached and contentious.[1]

The present custody order, in effect since July of 2016, provides a comprehensive custody arrangement: (1) Mother has primary physical custody of Child; (2) Father has partial custody that includes alternating weekends, every Wednesday from 2:00 p.m. until Thursday morning at the start of Child's daycare or schooling, and the option of every Friday when Child would otherwise be in daycare; (3) Father possesses the right of first refusal of physical custody of Child when Mother is traveling for work or her schooling; and (4) the parties share legal custody. *See* Order, 7/11/2016, at 1-2.

In April of 2018, based on cross-petitions filed by the parties, the court ordered Mother, Father, and Child to attend family counseling and appointed a guardian *ad litem*, Sherwood P. Grabiec, Esquire ("GAL") to represent Child's best interests.

On July 2, 2018, Mother served Father with a notice of relocation with Child. Father filed a counter-affidavit regarding relocation, objecting to the relocation and modification of the custody order. Subsequently, on August 2, 2018, Mother filed a petition requesting a relocation proceeding.

Mother sought relocation after she had attended Massachusetts Institute of Technology ("MIT") from 2016 to 2018, and graduated with a postgraduate

---

[1] *See* Trial Court Opinion, 3/5/2020, at 2-7 (full history of protracted litigation regarding the custody dispute).

Master of Business Administration ("MBA"). Upon graduation, she was offered

employment by a company, AXA Group, in Boston, Massachusetts.

The court conducted a custody/relocation trial on June 27, 2019, August

27, 2019, October 23, 2019, November 15, 2019, and December 23, 2019.

The trial court provided the following synopsis of the trial testimony:

> Samantha Ashby testified that she is [Child]'s daycare owner (The Learning Center) and has known him for a lengthy period of time. She indicated that "[Child]'s very bright He's a smart kid, very, very funny, constantly goofing around. He's just all around - just a really, really cool kid. . . . he's just a really bright, energetic, pretty well-behaved kid." She further stated in response to a question if [Child] is doing great in her daycare program, she replied, "He does. He thrives."

> The Guardian ad litem, Sherwood P. Grabiec, Esquire, testified in both parties' case in chief. …

> Regarding his recommendation (GAL Report filed 5/10/2019), he stated ". . . I would have to give a certain amount of greater weight to the opportunities that may be available to [Child] in the Boston Area." He further testified, "[a]nd I want to stress that I'm not a parenting coordinator. I'm not a custody evaluator. I don't have the expertise in that field. . . But again, I guess at the end of the day, I thought both parents were capable, caring. But if you have to point the finger at one or more factors, the opportunities probably in Boston are greater." Regarding the minor child, he testified ". . . [Child] is seemingly a pleasant, happy boy that is functioning under the circumstances that are - that he's confronting. Namely, that parents are trying to provide for him, care for him. Seemingly, they're trying to function under a custody schedule that provides meaningful interaction on behalf of [Father]. [He] by all accounts has been a very involved father, and that's very comforting. [Mother], again, an attentive [m]other. At the end of the day, this is a very difficult situation with regard to what I perceive as [Mother]'s reasonable desire to enjoy the fruits of her academic success, which I think will certainly in many ways benefit [Child]. I've heard a lot of information with regard to the experiences that [Child] has with his extended family and that is great, and I would hope those

would continue. The circumstances of [Mother]'s situation are that she doesn't have as an extensive family network in the area. I would hope, and I also am mindful of the fact that [Child] had some in his six years, almost seven years, he's had a lot of nice experiences with church and sports and a really, really strong relationship I would hope with his father. I don't doubt that. I would hope that [Child] would be able to have a lot of meaningful continuing experiences with his mother. And I don't doubt that, you know, she will pursue, you know, those opportunities."

He further testified, "[Child]'s had the ability to enjoy a lot of experiences with his father. I would imagine that would continue. Maybe modifications would have to be made. He is by all accounts in my estimation getting by really well with - under the current situation."

Regarding the relationship between Mother and Father, he testified ". . . [Child] doesn't perceive that his parents talk to one another that much. They may communicate in other ways. But they don't really talk to one another. That's the sense I have just from going through the file, too. This has always been seemingly this type of - you know, historically, this is the case. There's ongoing tension."

Father presented expert witness, Dr. William V. Fabricius, an expert recognized in the field of developmental psychology and relocation custody matters. He stated his studies involve the effects of relocation associated with children's outcomes. He stated in regards to relocation factors, one, two and six, that his "recommendation would be not to allow [relocation] because of those three factors. Now, I'm not talking about the other factors, but my expert opinion based on data I have relevant to those factors is consistently and strongly against allowing the relocation, for the child's best interest." Regarding the conflict and hostility between the parties in this matter, he stated, "[in] the hundreds of cases we've studied, the hostility and conflict did not go down after relocation, it remained high. The conflict went down in families that did not relocate. There is no data that I'm aware of to indicate the opposite. . . . The conflict was higher among the families that relocated years later than among the families that, in fact, didn't. And among the families that don't relocate, typically you find conflict reducing in the several years after the divorce." Dr. Fabricius recommended equal involvement by Mother and Father in the child's life.

As an additional expert witness, Father presented, Dr. Toni J. Evans-Barton, CEO of The Fatherless Generation Foundation. She testified regarding fatherless children and the possible negative effects on same. She stated her "professional experience is reunification and dealing with fatherlessness" and further explained "I am a licensed and ordained minister, and I also have a certification in divorce and family-reunification mediation, and then I also am a cognitive behavioral–life coach and practitioner."

She opined that [Child] fits into the category as a fatherless child, because "[Father and Child] don't live together." In regards to the relocation request, she stated, "I don't believe it's a good idea at all, I do not believe it should be approved, simply because six hours away has proven, not through my research but even by the expert before me, that six hours away is just too much time. And then looking at the six hours is not only six hours away, but it's a twelve-hour trek, one way and then back. And that becomes stressful on a child to have to spend most of his time in the car concerning parenting time and visitation with that particular parent, whether it's mother or father. I've had children testify and say, I didn't want to drive all the way to Ohio to spend time with my father for a weekend and then have to drive back, only once a month. I would have rather stayed at home. Which then becomes an erosion on the relationship with the father." She further stated, ". . . The child needs as much of a normal life as possible. And when two parents live as close as possible, without dealing with all the conflict that we're talking about here today, they don't have to get into conflict living that close together, I don't want them to live around the corner from each other, but what I'm asking is to live as close as possible so that [Child] can stay in the same school district when he's with his parents, he can have the same friends, he can have the same activities, and he doesn't miss a beat whether it comes to visiting the other parent That's a part of stability."

Mother presented expert witness, Dr. Kenneth Lewis, an expert in the field of child custody involving relocation. He testified he was involved with the parties since 2013, when ordered by the Honorable Muroski to perform a custody evaluation of the parties. He stated his 2014 report focused on "[a]ttachment theory and . . . miscegenation" which he explained the latter was an infant born of "two parents of different cultural backgrounds, races or ethnic backgrounds. In this case it's Anglo American, white, as we say

and Indian, Indian American." He stated ". . . with regard to miscegenation, [Father] did not seem knowledgeable about any problems that would be to a miscegenated child in a small town like Exeter. [Mother] was aware of it; [Father] was not."

Regarding his latest, 2019 report, he stated "I reviewed reports from Dr. Evans-Barton from Georgia and Dr. Fabricius from Arizona, and my own report from 2014 and the addendum from 2014, and other materials. . . . I reviewed the statistics that greatschools.com produces in relocation issues and studied the scoring that's given to the schools that [Child] would possibly go to, one here and one there." He explained "[g]reatschools.com is statistics derived from the data that the various school districts give to the organization. And they do statistics. They do the analysis on a ten-point scale . . . they make an overall rating of five for Wyoming Area." Further, he explained, "I also looked at this other part of Pennsylvania in another case I had, which is not far from here, Lycoming County. I had three cases in Lycoming with Judge Clinton Smith. And I used the same resource, greatschools.com. And it rated very, very low. It rated six or five, as I recall. I think it's general knowledge to people in academia that the Boston area provides by far [the better] academic environment for children than Central Pennsylvania." He stated ". . . [t]he Wyoming Area School District or SD was rated or is rated by the greatschools five out of ten. The Lexington, Massachusetts was rated nine out of ten." He stated he disagrees with Dr. Evans-Barton's opinion that "[preserving a relationship a parent/child with a non-relocating parent is, she says, impossible." Further, "I think of military families; I think of all the relocation cases I've done where the parents are very involved long distance. So I don't understand how she would conclude it's impossible."

In conclusion he added, "[s]o I disagree with that statement, relocation will emotionally harm the child." "With regard to the quality of life, there's no question in my mind that the educational facilities for [Child] through the years ahead would be far superior in Lexington, Massachusetts. That's a primary concern. But secondary to that but close up would be the cultural factor. I've spent some time in Luzerne County. I don't see it as a diverse community for a miscegenated child. On the other hand, I looked up statistics from our national government. There's 86,000 people who reside in Lexington, Massachusetts. The percentage of Indian Americans is 2.28 percent. So there's a

rather large community available for interaction. I think that's significant, also."

He further concluded, ". . . a plenary hearing should happen once. If it's done right, that's what we hope for. For our children to be caught up in litigation forever and ever is not good."

Father explained to the Court that he is employed by Intermetro Industries in the R&D Department and his annual salary is $110,000.

Father explained Intermetro permits flexibility regarding his work schedule: ". . . [Child] needs something, whether it's a call from the school or whether it's a call or text from [Mother] or a doctor, I'm able to leave work and either go to school or run to a doctor's appointment, which I've done several, many times over the course of [Child]'s life."

Father presented dozens of pictures regarding [Child]'s familial and friendly relationships and activities. One picture was explained: "This is Friday, February 15, 2019. This is [Child] at our friend Lisa Price's farm. We did some dog training or our dogs that day on a Friday. I had part of the day off of work, and [Child] thought it was very, very interesting. The dog, the whiter dog, that's our dog Maya's mother. And the other dog with the orange collar, that is Jamie, that's our dog's littermate brother." Another picture was described as, ". . . that's Christmas Eve of last year. He's hanging out with his cousins, Cameron and Scott. The middle photo is half of Fourth of July of 2018, that's [Child] with his cousins Gianna and Gabriella. [Child]'s in the middle of the picture. He's also right smack dab in the middle of their ages." Another he explained was "[t]hen November 21, 2018. That's [Child] helping my dad grind some meat in the garage of our home." Father continued, "The next picture, page one, top photo, October 12, 2018. That's [Child] playing with two kids in the neighborhood. That is Braden and Bryce Gaylord. And then in the middle photo on page one, April 3, 2019. That's [Child] playing street hockey with the neighborhood children again, that's Bryce Gaylord and Chase Clark.' Another photo was explained, ". . . October 13, 2018, this is [STEM] day held at the Pittston Area High School. [Child] was building some type of molecule replica with cheese balls and toothpicks." Father added that Mother was not present for the [STEM] day activities. He further elaborated on photos from the December 18, 2019, Breakfast with Santa at

Pittston Area School; the April 9, 2019, Bunny Brunch; the August 27, 2018, the Kindergarten Orientation Day; the October 23, 2018, Patriot Dash (Father chaperoned the event for [Child]'s Kindergarten class); the March 31, 2018, Easter Egg hunt held at the Holy Redeemer church grounds; October 10, 2018, Roba's Farm Kindergarten class field trip (Father chaperoned the event for [Child]'s Kindergarten class). Father testified that Mother did not attend any of the above–mentioned events.

Father presented a stack of pictures and explained that "[i]t showed [Child] playing baseball and enjoying himself playing the games, enjoying himself playing with teammates. It's showing him enjoying himself with me as the coach and probably some of all of us together with the teammates; but, yes."

Father testified that he has coached [Child]'s soccer teams: ". . . [i]n the spring, I was the head coach. In the fall, I was an assistant coach." He explained Mother was "not in favor of [Child playing soccer]." He elaborated, "She thought that it was too dangerous and would cause concussions and CTE which I believe stands for chronic traumatic encephalitis." Father explained [Child] has missed one-half of his soccer and T-ball games due to Mother refusing to take him during her periods of custody. ". . . [I]n the fall of this year, he missed approximately half of his games. And in the spring, he missed approximately half of his T-ball games."

Father testified, ". . . [L.G.] is like a perfectly normal, happy kid. I mean, we're very, very fortunate. I mean, he's happy. He eats well, he likes six-year–old foods, he likes his vegetables, he likes McDonald's. He loves to run around. He likes to bike, he likes to go see the kids, he likes to play soccer. He loves to play with the dogs. He knows how to train the dogs. You know watching that develop has been interesting. He pretty much falls into the center of the bell curve on what you would expect of a six-year-old as far as likes. I mean, he likes ice cream. He needs - I mean, he's six, so he needs to be disciplined, which I discipline him. But, I mean, he's not at all a troubled child."

He added that [Child] has not had any health or injury problems in the last five years: "No. [Child] runs, he jumps, he plays. Does he get the occasional cold? Does he get the [occasional] ear infection? Yes. But he's like we're so blessed because I know people that have where their kid have health

problems and all you can do is pray for them to help them out, but we are blessed that [Child] is the running, jumping. He's conversational. He's mentally with it. He's very lucid. He knows who to trust. He knows who not to trust. We are very, very blessed and fortunate with [Child]'s current physical and mental state."

Father explained his opposition to relocation that [Child] "is a normal, healthy, happy child. He is thriving in his current world that he knows which is school, family, the area, church . . . he is such a well-rounded, normal, well –behaving happy kid." He further stated, "[Child's] continued relationship with both parents is extremely important for his health and well-being." He added, "Now, do I intend to be his dad? Now, I – it's almost impossible or it is impossible to do from six hours away. There's no little league, there's no soccer, there's no school functions, there's no homework, there's no making him his meal, there's no giving him his bath. Okay. He likes to play with his friends. Okay, I worry about the downstream effect for [Child] more than anything."

Mother testified her address is 69 Emerson Gardens Road, Lexington, Massachusetts. She stated ". . . I stay, when I'm in town in Pennsylvania, at 102 Schooley Avenue, Exeter Pennsylvania," and Kate Mangan and her two children live there, also.

She stated she met Father while working at Schott Optical, in Duryea and Exeter. She explained their initial relationship, "[a]fter the initial encounter with [Father], he did not - he basically told me that he was not interested in a relationship. He was interested in buying me dinner occasionally and taking me home. That was about the extent of what he wanted." After becoming pregnant "he introduced me to his parents and - he moved in with me for some time until it was intolerable for me, and I kicked him out of my house." She stated their relationship ended before [Child] was born.

She described her employment at Schott and her degree of education. "Until 2018, I worked at Schott . . . I started as a productive development scientist at Schott. And I moved into global product management with direct report to Germany . . . I was a Ph.D in physics."

Mother explained her early career aspirations. She stated prior to [Child]'s birth she "imagined that I would follow normal

career ladder and expected to be in leadership position in a reasonable amount of time which is normal for industry careers and have some management responsibilities associated with it." She explained "she was the global product manager for laser materials which supplied laser pieces all over the world for cutting-edge laser weapons." She stated "travel was directly related to performance in terms of meeting the fiscal-year plan for numbers or profit. So when you have customers in Japan, in Korea, in Germany, all over the world, in India, the expectation was that you meet those numbers. An[d] in order to meet those numbers, you would have to go talk to the customers on-site and see what they're doing and give them solutions as a scientist and as the lead of the product." After meeting with the talent management at Schott, they suggested her career opportunities regarding a management position would increase if she would move to Germany.

Subsequently, she decided to further her education and attended [MIT]'s Executive Masters of Business Administration, in 2016 to 2018. During that period, the custody schedule established by the Honorable Muroski was maintained as much as possible. ". . . [S]ome switches between Wednesday and Thursdays were occasionally granted when [Father] agreed. Most of the time, [Child] came with me during class time. Especially during the ten-day schedules that I've had on location in classrooms, [Child] came with me; and I would arrange for a family member to babysit him." "So my brother - on short weekends, my brother watched him while I was in class. Occasionally, he came to classes with me. And on other lengthy periods, I had my friend from California fly in to help me take care of [Child] while I was in classes." [Mother] graduated from the MIT MBA [program] on June 7th, 2018.

Regarding her employment at Schott, Mother stated she felt "that I was being pushed more and more into sales and that my role was becoming a salesperson rather than being able to apply any of my education that I had gained over the years, not physics, not the management, not analytics, none of this." Around this time, as she was interested in "some more responsibility and a less sales - oriented position with Schott", she began seeking other employment. She was offered a leadership job by a classmate from MIT and interviewed with AXA Group, a financial advisor, property and [casualty] insurance company. She stated the "[t]he monetary compensation was significantly higher than I

was receiving at Schott. And also, my ability to grow into a real executive career was also much more plausible within the United States; and I didn't have to travel very much once I was on location in Boston." She accepted the offer at AXA in July of 2018 and ended her employment at Schott in the same month.

She explained that while in Lexington ". . . I have friends with kids [Child]'s age. So we usually spend time with them. We go to birthday parties. What [Child] likes doing mostly is going to the Children's Museum in Boston and also the Science Museum . . . and [Child] enjoys the exhibits. He enjoys interacting with the various play, science activities that they have. One time that we were there, the MIT freshman engineering students were exhibiting their product designs that they were having the kids try out. These were various toys that they had invented as part of their school project for mechanical engineering class, and [Child] got to test it out. . . They get to do electronics, wiring, and diagrams, things like that. So it's opportunities like that that I haven't really had in the immediate area."

Mother then described the schools she researched in the Lexington Area. She stated, "[s]o the school system in Lexington, Belmont, Newton, Will, any of the Metford, Bedford, that local area, they are all 9 or 10 A-Plus school districts which there would be – it's very - having Brown University, Boston University, Harvard, MIT, UMass, Northeastern, with every college, very high level colleges concentrated in a small area, the education is – there's a huge focus on education by the parents in the area, by the universities putting stuff out into the local areas. And the schools have a lot of funding."

She explained that [Child] is currently attending the Pittston Area School District for 2018 and 2019. Regarding his performance, she stated, ". . . [Child] performed well in the tasks from what I could see. I also worked with him quite a lot. He was quite slow in coming up in terms of the handwriting. But he's much more mathematically-orientated. He could use much more challenge in terms of his math skills. When he started school, I would say that he could add and subtract. They didn't quite get into that until later in the year. So in terms of - so to me, it's setting expectations, right? You can say he did phenomenally well. He thrived when your expectations are low from the children all together. But if I compare [Child] to the other children in the

- 11 -

Boston area, he's quite behind." Further she stated, "[a]nd he could be further advanced than where he is today."

Regarding [Child]'s extracurricular activities, Mother stated, "So I went to the parent teacher conferences. They set up different ones for [Father] and I, his teacher. But I have not attended any of the PTO events because I'm trying to maintain my job which I think is more important." Mother stated she has been living in the Pittston area since April 2011. She stated, "It's been quite challenging for me to make social connections in this area. First of all, my skin color - I would say to be completely open - is an obstacle to it. The only source of support that I have had over the years is – Beth [Gober-Mangan]'s family, Beth and her family." She continued, "I've attended a few birthday parties. It was really awkward for me. I was at Chuck-E-Cheese's for one of the birthday parties. No one really - I went up to talk to them. No one really came up to talk to me. All the moms that knew each other kind of grouped together. So it was a very awkward and intense situation for me. They just really - it felt to me like they didn't really appreciate me being there. And I'm always extremely concerned about the fact that how [Father] and his family bash my relationship. And I don't know who they know and how they're going to act around me. So it's been a very tense, very awkward environment for me. When we started going through the custody situation, [Father] went and said very mean and negative things about me to pretty much everybody on the floor at Schott. So I was very worried about interacting. That also affected my ability to form social connections in the area. Him being so integrated into the community, I don't know - even my [neighbor] was a - in Pittston area - was a witness for him in his witness list on the pretrial brief. I mean, so I don't know who I can interact with in a safe manner. So I don't feel safe, yeah. So I would say other that Beth's family, I have not had many social opportunities for social interactions in this area."

But she stated, while she's in Boston, "It's completely different. I feel completely safe. I have significant friends, female friends, highly accomplished. They're smart. Their kids are smart. I feel welcomed, and I feel like I belong there compared to here."

She further testified her father and step-mom live in Ocala, Florida and her brother lives in New Jersey. Her extended family lives in Australia and her close friends live in San Francisco and

Washington, D.C. She explained the majority of her family is "still in India."

She went on to explain the activities [Child] enjoys. She stated, "So in terms of sports, I would say his favorite – he's a water baby. He loves the water. He likes swimming. So I was happy that we found that. He is not coordinated enough for team sports, I would say. I haven't - he's interested in soccer from what I can see. He likes bicycling, scooting, the normal activities that kids like. He likes guitar. I've seen him actively trying to practice on guitar, and he likes piano. So I would like to get him into a musical program. He likes doing math . . . I would say, from his school experiences and from his daycare, in terms of comparing athletic ability of other kids around him, I wouldn't say he's athletic, per se. But I think kids should be well-rounded. So I would like to see him take up a sport."

She then explained that ". . . [Child] is not receiving here is a cultural education. He is half Indian. There's no denying that. He's not just Luther[a]n Catholic. So I don't see any opportunity for him to experience anything related to my traditions or my - anything Indian in this area."

She described the cultural activities in Lexington: "[s]o we have many festivals, the festival of lights, the Diwali Festival where the community gets together. There's an Indian-American League in Lexington that we go to these activities, dances, traditional dances, teaching that for kids. They have soccer. They have cricket. They have all these sport activities that they organize. They have Navratri which is New Year's celebrations - Lexington does - and Chinese New Year's celebrations. So observing Ramadan - having the ability to participate in the global activities, that's not something I've seen here." She stated she has "seen some activity in Scranton. But it's mainly Hindu related. And I'm not Hindu. I'm Christian."

Regarding her experiences in the Pittston and Luzerne County area, she stated, "I feel like I'm in jail here somewhat. I feel alone. I don't have many connections, so yeah. It's not a happy place for me. And it hasn't been in a long time, ever since this whole custody stuff started. [Father] and his family, I would say, have made my life hell. I've had incidents where people were trying to run me off the road. I don't know who is related and why. So I've driven in the shop parking lot to wait it out."

She explained [Child]'s daily routine, during her periods of custody: "Usually I start my work at 4:30 or 5 a.m. in the morning. I take meetings and calls with India at that time. And then when [Child] wakes up, he wakes up anywhere from 6:45 to 7:30 depending on when he went to bed. And I get him dressed, and I drive him to the daycare. And then I come back to work. So that's my typical schedule when I'm in Pittston or Exeter. And then when I'm in Boston - usually, I'm in Boston when I don't have [Child]. When I have [Child], I stay home with him and do my work from home, yeah. . . And I pick him up in the evenings between 5 and 6 from the daycare. So [Child] takes the bus from the daycare to Pittston Area. And then takes the bus back from daycare to - from Pittston Area to daycare. And on [Father]'s custody, he picks [Child] from either the daycare or from the school."

Regarding her recent work and travel schedule, Mother stated, "It's been fairly suicidal. I mean, there is quite - depending on trying to get back from Pittston from Boston on a Thursday, it's - in traffic, it's a fairly significant effort to make sure that I get everything done, to make sure that I am getting the face time I need, that I'm visible, all of this. So it's been physically incredible. But I've managed to deal without any traffic incidents or any major accidents. I mean, I've driven, I would say, 50,000 miles so far." "My time with [Child], I would say. It has affected some amount of the quality time with [Child] because I am tired after all of this, so yeah."

In response to her counsel's question regarding the benefits to [Child] if relocation is granted, she responded, "[s]ignificant to me is the education system, the environment, the safety, that he's got a multi-cultural environment, and the ability to participate in activities other than just church. And I would say [Father]'s family is extremely homophobic. So he's around people who are a bit more open-minded. He's got opportunity to participate in the robotics program at the MIT museum. He's got opportunity to interact with that medium. He's got events and teachings that they do in terms of computers and coding at the science museum and the children's museum. And these are so integrated into the community. The kids overall just seem to be doing so much more entrepreneurially at a younger age than anywhere here from what I can observe. And so I feel like overall - if he and I want to start a company in Boston, for us, there's so much more opportunity

- 14 -

for us to get the funding and support for the two of us to start something from a new product, a new idea there than here."

In response to her counsel's question regarding the benefits to herself if relocation is granted, she stated, "I'd have friends. I'd have community. I feel safe. Mentally, I'm a basket case here. I don't feel comfortable. And people will tell you, I will ask, who's that: who's that. So I'm often at my friend's Beth bar where they serve customers. And I don't like going to the bar area where people are because I don't know who's showing up there that's [Father]'s friends in order to check up on [Child] and me. So I try to stay in the back and try to help her cook. So it's not a comfortable situation for me." She went on to state regarding her motivation to relocate "[i]t's motivated - and if I'm completely honest, I would say I have some motivation behind separating [Father]'s mother from [Child]'s life a little bit because I feel like she's the cause of a lot of bad phrases that [Child] - and criticisms for me. So I would say, yeah, there is a factor for me."

On cross examination, Mother was asked how the difference between living in the Pittston area making $129,000 and living in the Boston area making $190,000 would benefit [Child], she replied, "It makes a huge difference . . . I can afford a nanny, for instance." She further explained, "If I wanted to, it would be additional help for me. It would be someone I trust. It would be someone who could help with doing cooking, some of the laundry, so yes. I think I don't need one, no. I can handle all of this myself without the help of a nanny."

Father's counsel questioned Mother regarding the court-ordered Right of First Refusal: She responded, "It just says when I'm traveling for work but when my primary work location is Boston, if I ask Beth to pick up my son from daycare because I'm a half an hour late to get there by 6 p.m., I don't see a reason to text [Father]. I don't need [Father]'s approval to do my day-to-day."

In response to Father's counsel's question regarding Mother's attendance to [Child]'s school's extracurricular events, such as field trips, the Patriot Dash, Breakfast with Santa, the Bunny Brunch, Easter candy, she stated, "I already said I have not attended any of these. And I never felt comfortable attending any of these because these were all [Father]'s friends. And I felt like it was also scheduled when he knew I was out of town."

- 15 -

Additionally, in response to Father's counsel's question regarding [Father]'s attendance at T-Ball, she replied, "No I didn't agree to him playing T-ball which is why I'm saying I don't know whether he played or not." In response to the question of why [Child] doesn't go to practice or games, when he's with Mother, she replied, "Because it's my time, and I want to spend it with my child the way I want to. . . It's not whether or not I want him to play T-ball or not. It's that I want to spend time with my child the way I want to spend time with my child. When I'm working this hard, I have opportunity for spending time with him other than the way how [Father] prescribes my time should be."

When asked if [Child] plays soccer for the Pittston Stoners, she replied, "I don't know the schedule. It's not important to me. I haven't paid attention to it." "I think - I know that he signed him up for some soccer. I don't know if it's Stoners soccer or whatever soccer it is." She further stated she never attended any of his soccer or T-ball games. "Again, I've already stated that during the times that [Father] has [Child], I am in Boston working. Again, I do need to make a living. So there is priority here."

In response to counsel's question regarding her referring to Father as a sperm donor, she replied, "I have yes . . . [b]ecause he was never interested in being an actual father. And I strongly feel that the majority of what he's doing here is more about the fight rather than actually being a parent."

Father presented nearly two dozen witnesses that testified they had observed Father and [Child]. The witnesses described events they participated in with the two (soccer, church, school field trips, etc.) and the interactions between them. The witnesses described the relationship as loving and Father as devoted to his son.

Trial Court Opinion, 3/5/2020, 8-31.

On March 5, 2020, the court entered an order, and corresponding opinion, denying Mother's petition for relocation. The court also concluded the July 11, 2016 order "of shared legal custody with Mother as primary physical custodian and Father enjoying partial physical custody with right of first

refusal, provides for the best interests" of Child. Trial Court Opinion, 3/5/2020, at 42. Mother filed the present, timely appeal.

Mother presents the following issues for our review:

1. Whether the trial court abused its discretion and committed an error of law in its application of the relocation factors, 23 Pa.C.S.A. § 5337(H), more specifically:

   i. Did the trial court abuse its discretion and commit an error of law in its application of 23 Pa.C.S.A. § 5337(H)(2) by failing to consider the evidence presented regarding the increased educational opportunities and increased cultural opportunities available to the minor child if relocation were to be permitted?

   ii. Did the trial court abuse its discretion and commit an error of law in its application of 23 Pa.C.S.A. § 5337(H)(3) in determining that "Father's present periods of partial custody would be greatly affected by Mother's relocation with [Child]?"

   iii. Did the trial court abuse its discretion and commit an error of law in its application of 23 Pa.C.S.A. § 5337(H)(5) by failing to consider the evidence presented regarding the attempts by Father to thwart Mother's relationship with the minor child?

   iv. Did the trial court abuse its discretion and commit an error of law in its application of 23 Pa.C.S.A. § 5337(H)(6) by failing to adequately consider the evidence presented regarding the enhancement to the general quality of life for Mother?

   v. Did the trial court abuse its discretion and commit an error of law in its application of 23 Pa.C.S.A. § 5337(H)(7) by failing to adequately consider the evidence presented regarding the enhancement to the general quality of life for the child?

   vi. Did the trial court abuse its discretion and commit an error of law in its application of 23 Pa.C.S.A. § 5337(H)(10) by failing to adequately consider the

evidence presented regarding the fact that the child is a miscegenated child and the importance of such a consideration in his development?

2. Did the trial court abuse its discretion and commit an error of law in determining that Mother failed to meet her burden of establishing that relocation will serve the best interest of the child?

3. Did the trial court abuse its discretion and commit an error of law in determining that denying the relocation best serves the needs and welfare of the minor child?

4. Did the trial court abuse its discretion and commit an error of law by placing significant weight on the need for consistency in the child's life as justification for denying the relocation?

5. Did the trial court abuse its discretion and commit an error of law by disregarding the recommendation of the Guardian ad Litem, who recommended granting the requesting relocation?

6. Did the trial court abuse its discretion and commit an error of law in allowing Torri J. Evans-Barton to testify as an expert in the field of fatherlessness children in relocation over Mother's objection?

7. Did the trial court abuse its discretion and commit an error of law in recognizing the field of fatherless children in relocation as a recognized and accepted field of expertise?

8. Did the trial court abuse its discretion and commit an error of law in failing to recognize that the weight of evidence favors relocation of Mother and the child?

Appellant's Brief, at 5-8 (some capitalization omitted).

All claims advanced in Mother's appeal concern the trial court's order denying her petition for relocation. We review the entire record with deference to the trial court's credibility assessments:

[O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that

- 18 -

are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*A.D. v. M.A.B.*, 989 A.2d 32, 35-36 (Pa. Super. 2010) (citations and quotation marks omitted). The propriety of relocation must be decided on a case-by-case basis that does not easily conform to bright line rules:

With any child custody case, this Court has long stated that the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all of the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child. When a custody dispute involves a request by a party to relocate, we have explained, there is no black letter formula that easily resolves relocation disputes; rather, custody disputes are delicate issues that must be handled on a case-by-case basis.

*C.M.K. v. K.E.M.*, 45 A.3d 417, 420-421 (Pa. Super. 2012) (citations and quotation marks omitted).

Section 5337(h) of the Child Custody Act, 23 Pa.C.S.A. §§ 5321-5340, sets forth the factors which a court must consider when determining whether to grant a proposed relocation:

**(h) Relocation factors. —** In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

- 19 -

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h). "The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as

shown under the factors set forth in subsection (h)." 23 Pa.C.S.A. § 5337(i)(1). Moreover, "[e]ach party has the burden of establishing the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation." 23 Pa.C.S.A. § 5337(i)(2).

> [Lastly, 23 Pa.C.S.A. § 5323(d)] requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328(a) custody] factors prior to the deadline by which a litigant must file a notice of appeal. Section 5323(d) applies to cases involving custody and relocation.
>
> In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d).

*A.V. v. S.T.*, 87 A.3d 818, 823 (Pa. Super. 2014) (citations and quotation marks omitted).

At the outset, we note the trial court did not conduct a Section 5328(a) custody factors analysis. *See* Trial Court Opinion, 3/5/2020, at 31-32. However, neither party objected to this omission. Moreover, a review of Mother's arguments on appeal do not concern the lack of any Section 5328(a) analysis. Accordingly, Mother has waived any argument regarding the court's omission. *See* Pa.R.A.P. 302(a). We now turn to the merits of Mother's claims.

Mother first claims the trial court abused its discretion and committed an error of law in its application of the following relocation factors – Section 5337(h)(2), (3), (5), (6), (7), and (10). *See* Appellant's Brief, at 26-48. Central to each factor, Mother complains the trial court failed to adequately

- 21 -

weigh certain evidence that was in her favor. For example, as to Factor 2 (the age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child), Mother argues the court "failed to adequately weigh the evidence presented regarding the increased education and cultural opportunities available to the child if relocation were to be permitted." *Id.*, at 27. She states that the child was considered to be advanced by his daycare provider, and she presented uncontroverted evidence that Lexington schools were given a higher rating than Luzerne schools. *Id.*, at 28. She also points out that her witnesses and the GAL corroborated this evidence. *See id.*

Another example is Factor 3 (the feasibility of preserving the relationship between the non–relocating party and the child through suitable custody arrangement, considering the logistics and financial circumstances of the parties). Mother states she proposed that the "every other weekend scheduled be maintained with the parties meeting at a halfway point or her doing all the transportation at times she came to visit the area and also for extended time periods during holidays and when the child is off from school." *Id.*, at 31. She also suggested every other week during the summer time for Father to have custody. *See id.* Mother states this "proposed custodial schedule provides a very similar amount of custodial time for Father[,]" and therefore, "Father's periods of custody would be minimally impacted, if at all."

*Id.*, at 32. Additionally, she states that because she is no longer enrolled in school and has less travel associated with the new employment position, "Father will not miss periods due to his inability to exercise the right of first refusal[.]" *Id.*, at 33.

A final example is Factor 7 (whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity), in which Mother asserts the court failed to properly credit enhancements to her situation that would provide improvements to Child's quality of life. *See id.*, at 41. She states the court failed to consider substantial increases in her "compensation package and benefits and in her psychological well-being and the impact such would have on the child's well-being." *Id.*, at 42. Mother suggests the court failed to adequately consider additional possible advantages, including the educational and cultural opportunities of Lexington. *See id.*, at 43-45. Lastly, she alleges the court disregarded the fact that Child has spent extensive time in Massachusetts since 2016 and demonstrates a comfortability level with being in the Boston area and traveling back and forth. *See id.*, at 44-46.

Contrary to Mother's position, "[i]t is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (emphasis added). Additionally,

> [t]he parties cannot dictate the amount of weight the trial court
> places on evidence. Rather, the paramount concern of the trial

- 23 -

court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

***R.L.P. v. R.F.M.***, 110 A.3d 201, 208 (Pa. Super. 2015) (citations omitted).

As noted above, the trial court issued an opinion, in conjunction with its relocation order, which contains a thorough analysis of each statutorily mandated relocation factor. ***See*** Trial Court Opinion, 3/5/2020, at 33-38. We will highlight the examples we pointed to in Mother's argument.

As for Factor 2, the court pointed to the following: (1) Child is a seven-years-old minor, who attends first grade at the Pittston Area School District, and is doing well in school and is secure in daycare; (2) he has never attended the school in Lexington, and testimony indicated that while the Lexington school system is more highly rated than the Luzerne County schools, Child is presently receiving age-appropriate education in Luzerne County; (3) Mother believes Child would receive more advanced education in Lexington; (4) Child has no special needs; and (5) Child receives medical services as needed in Luzerne County. ***See*** Trial Court Opinion, 3/5/2020, at 34.

Concerning Factor 3, the court considered the following: (1) the proposed city of relocation, Lexington, is 300 miles from the Greater Pittston area; (2) it is a six-hour trip one-way to Lexington from the Pittston area; (3) Mother commutes frequently to Lexington for employment and has called the trip "suicidal;" (4) Father's present periods of partial custody would be greatly affected by the relocation; (5) both parties are financially stable; (6) Mother

proposed Father may have additional periods in the summer and holidays breaks; and (7) Dr. Lewis suggested meeting halfway to exchange Child and video conferencing. *See id.*, at 34-35.

Lastly, as for Factor 7, the court noted: (1) although Mother earns more compensation in Boston, finances of both parties are and have been adequate to meet Child's needs since birth; (2) while Lexington schools are rated higher than the Luzerne County schools, Child is presently receiving proper age-appropriate education in Luzerne County; (3) Mother stated more cultural diversity and global cultural activities are available in the Lexington area, but not in the Pittston area; (4) according to Mother's witnesses, Lexington has children's communities, museum memberships, and good schools affiliated with nearby, major universities; (5) Father testified Child is receiving proper education in Luzerne County; (6) Child's emotional needs are also met and he is happy and thriving; (7) Child is safe and secure in his school, neighborhood and community activities, and Luzerne County has been his home since birth. *See id.*, at 36-37.

It is evident the trial court considered and credited Mother's evidence. Nevertheless, it was within the court's purview as the fact-finder to determine which factors are most salient and critical, and here, the court found some factors were more important than the ones Mother wishes to highlight. *See M.J.M.*, 63 A.3d at 339. The record overwhelmingly supports the court's findings, particularly regarding Child's current education and social success

and his need for stability. As such, we discern no abuse of discretion in the court's assessment of the Section 5337(h) factors. Therefore, Mother's first claim is unavailing.

Next, addressing her second and third claims together, Mother claims "the trial court erred and abused its discretion in determining that [she] failed to meet her burden of establishing that the relocation will serve the best interest of the child and in determining that denying the relocation best served the needs and welfare of the child." Appellant's Brief, at 49. Mother points to the court's finding that she offered testimony that relocation may be in her best interest but it was not convinced that relocation was in Child's best interest and that his physical, intellectual, moral, and spiritual well-being was sound. *See* Trial Court Opinion, 3/5/2020, at 41. Mother states she "presented evidence to substantiate the benefits to the child that far exceeded those which relate to her personal happiness." Appellant's Brief, at 50. She alleges:

> [She] considered the best interests of the child when obtaining her MBA, when leaving her employment at Schott, and also when researching potential schools and cultural opportunities for the child. Mother presented evidence regarding her significant increase in compensation and ancillary benefits; the increased and improved educational opportunities available to the child in Lexington, Massachusetts, based on her own research and experience observing the school districts; the cultural opportunities and access to diversity that the child would be exposed to as a child who is of half-Indian descent; her increased availability to the minor child; and the increase in her own personal well-being and feelings of safety, which will obviously positively impact the child.

*Id.* (citations to reproduced record omitted).

Mother states, "By failing to recognize or credit these improvements for the child, the trial court elevated Father's interests over the best interests of the child." *Id.*, at 51. Lastly, she contends the court disregarded the testimony of the GAL and Dr. Lewis, who both recommended that relocation was in the best interests of Child. *Id.*, at 51-52.

In assessing the best interests of Child, the court opined:

Mother and Father enjoy shared legal custody with Mother having primary physical custody and Father having partial physical custody with right of first refusal. The parents have always enjoyed financial stability. Each provides adequately for [Child]'s physical, intellectual, moral and spiritual well-being. Each parent devotes full attention to [Child] and when Mother may be unavailable, she has made proper child-care arrangements to ensure stability for [Child]. Father likewise provides full attention to [Child] and has an extended family available as a back-up, if needed. [Child] is in elementary school and daycare in settings which he is thriving educationally and socially with familiarity of friends and environment. [Child] is enjoying age-appropriate activities through school and extracurricular activities. He is most familiar with his neighborhood, well liked in his community, and a popular, active member in this community. The parties are to be commended for raising such an exceptional young man. His bond with both parents is strong, he is well-cared-for and loved. He is a happy, young child. He has numerous friends, family members, teammates, caring neighbors, as evidenced by the testimony.

Mother's desire to advance in her professional career is most commendable. Mother testified to her being safe and comfortable in Lexington. She enjoys a circle of friends and classmates and co-workers in Lexington. She has reaped a larger salary and challenging employment with possibility of greater opportunity to secure financing and support in pursuit of additional business ventures. She may seek the employ of a trusted nanny to assist with, *inter alia*, household chores.

Mother and Father are both financially stable and have been so even prior to Mother's present employment and increased

- 27 -

salary. No testimony was offered to indicate [Child]'s needs were ever inadequately met due to financial issues.

Mother offered testimony that the schools in Lexington are recognized as superior to those in Greater Pittston. Mother attested to availability of institutions of higher learning, museums, and cultural diversity and opportunity in Lexington. She testified that children overall just seem to be doing so much more entrepreneurially at a younger age than anywhere here when compared to Lexington.

The Court applauds any parent who wants what is best for their children. But when parents cannot agree, the Court must determine what is in the best interests of the child. "We reaffirm that in a relocation case, as in any custody case, the paramount concern remains the child's, not the parent's best interest." *S.M. v. R.J.*, 1802 MDA 2016.

"It is beyond the belief of this court that any parent would petition to relocate their children if said relocation would not contribute to the personal happiness and emotional well-being of the petitioning parent. If these particular benefits to the relocating parent were to carry such weight alone, few relocations petitions demand much more attention and time by the court, few would be denied, and the best interest of the children would take a back seat to the interests of the relocating parent in virtually every case." *Graham v. Graham*, 794 A.2d 912, 917 (Pa. Super. 2002).

[Child] is a normal, healthy child; thriving in his current world that he knows which is school, family, neighborhood and church. He is such a well-rounded, normal, well-behaving kid. The need for stability and continuity in [Child]'s education, family life and community life is paramount. Since birth, these needs have been adequately addressed and will not be disturbed at this point in his young life.

Both parents value education and vocational success. [Child] is appropriately educated for his young age. Parents should cooperate to enroll him in additional programs that may be of interest to him, based upon his liking. Proven successful stability and continuity in [Child]'s life abhors disruption and relocation to another community.

Finances are not and have never been an issue[] with the parties. [Child] has and will continue to have all his material needs provided for by both parents.

Mother offered testimony that relocation may be in her best interest but the Court is not convinced relocation is in the best interest of this seven-year-old, first-grade child. [Child]'s demonstrated development and success will not be disturbed at this stage of his life. His physical, intellectual, moral and spiritual well-being is sound.

The parties must cooperate to expose [Child] to the cultural traditions of both parents and all others. During Mother's periods of custody, she is encouraged to participate with [Child] in the Dewali Festival, the Indian-American League and the Navrati New Year's celebrations in Lexington. Father is encouraged to continue attending his Church's activities with [Child] during his periods of custody.

Mother, although sincere in her motivation, has not established that granting relocation will serve the best interests of [Child]. Additionally, Father has established his motives are honest in seeking to prevent relocation.

[Child], age 7, a first grader, is in a developmental stage of his young life where his physical, educational and emotional needs are presently and demonstrably adequately met. He is thriving and his best interests demand non-interference with his present, successful lifestyle. His emotional and educational needs are properly met. His quality of life is thriving and promising.

Trial Court Opinion, 3/5/2020, at 38-42.

Mother again attempts to argue the court did not give proper weight to certain evidence that was in her favor. However, she fails to present case law in which financial, educational, and cultural opportunities are the deciding factors in granting a relocation request. Additionally, while Mother presented this evidence, the court was within its discretion to conclude these improvements did not outweigh other factors and circumstances that

demonstrate Child's physical, educational and emotional needs are presently and adequately being met. Indeed, as the court pointed out, both parents share a strong bond with Child and he is thriving educationally and socially with familiarity of family and friends. The court could reasonably infer that the 300-mile distance between Luzerne County and Lexington would severely impinge upon Child's quality of life. Therefore, we conclude the court properly determined that the denial of the relocation request was in Child's best interests. Accordingly, Mother's second and third issues are without merit.

In Mother's fourth claim, she argues the court abused its discretion and erred by placing significant weight on the need for consistency in Child's life as justification for denying relocation. *See* Appellant's Brief, at 52. She asserts the court's reliance on *Johns v. Cioci*, 865 A.2d 931 (Pa. Super. 2004), was misplaced because the statement regarding continuity and stability was taken from a segment of the opinion where this Court was addressing the legal standard for review of a request for a custody modification as opposed to a request for relocation. *See id.* Moreover, Mother states:

> The trial court's determination that continuity and stability trumped the advantages available to the child if the relocation was permitted was not supported by the record. As stated above, the trial court adopted Father's position with regard to the appropriateness of the child's education and his developmental progress. However, Father admitted that the parties had explored other educational facilities in order to provide the child with a more challenging education.
>
> The trial court also completely disregarded the fact that the child has spent a considerable amount of time in the Boston area since 2016 and is very familiar with the area. At his young age,

the child has been traveling to the Boston area longer than he has been enrolled in school. Additionally, the child's extracurricular activities began in 2019, therefore, during the time testimony was taken in this case, the child was just becoming acquainted with those activities over Mother's objection.

Appellant's Brief, at 53 (footnote and citations to reproduced record omitted).

Mother contends she met her burden and the court erred because "the evidence presented demonstrated the child has experienced a different continuity than that found by the trial court." *Id.*, at 54.

Initially, it merits mention that to the extent Mother argues the court improperly relied on *Johns*, a review of the trial court's opinion reveals no citation to that case. Furthermore, the two cases explicitly relied on by the court, also do not cite *Johns*. *See* Trial Court Opinion, 3/5/2020, at 40.

Nevertheless, the court's reference to the importance of continuity and stability in a child's life is not misplaced. In conducting a relocation analysis, a court must determine the child's best interest by considering the custody factors outlined in Section 5328.[2] *See A.V.*, 87 A.3d at 823. "The need for stability and continuity in the child's education, family life and community life" is an enumerated factor. *See* 23 Pa.C.S.A. § 5328(a)(4). Therefore, the court acted within its discretion by finding that Child's need for stability and continuity was paramount when deliberating on Mother's petition to relocate.

_____

[2] It merits reiterating that the court did not discuss all of the Section 5328 factors, but Mother did not raise this issue on appeal.

- 31 -

Lastly, like her prior issues, Mother essentially argues the court erred in finding that continuity and stability trumped the advantages available to Child if the relocation was permitted and did not give proper weight to certain evidence that was in her favor regarding this factor. Contrary to Mother's argument, we again defer to the findings of the trial court, and it was not required to give one factor greater weight than another. The evidence at trial established: (1) Mother devotes her full attention to Child when he is in her custody and when she is unavailable, she has made proper child-care arrangements to ensure stability for Child; (2) Father also provides full attention to Child and has an extended family for support who Child is close with; (3) Child is thriving educationally and socially with familiarity of friends and environment; (4) Child is enjoying age-appropriate activities through school and extracurricular activities; and (5) Child is most familiar with his neighborhood and is well liked in his community. If Child were to relocate to Massachusetts, he would be without this network that he has been surrounded by since birth. Therefore, we cannot conclude the court abused its discretion. Accordingly, Mother's argument fails.

Next, Mother argues the court abused its discretion and committed an error of law by disregarding the recommendation of the GAL to grant relocation. *See* Appellant's Brief, at 54. Mother states the court "failed to explain why the GAL's unbiased recommendation was not accepted" and the

court's "decision to deny the relocation [was] not supported by the evidence of record." *Id.*, at 56.

As Mother acknowledges, the recommendation of a GAL is not binding on the trial court. *See id.*, at 55. Rather, a GAL's opinion is to be considered advisory only. *See In re Adoption of R.J.S.*, 889 A.2d 92, 100 n.8 (Pa. Super. 2005); *see also C.W. v. K.A.W.*, 774 A.2d 745 (Pa. Super. 2001).

A review of the record reveals the following. The GAL had been involved in the case since May of 2018. He first met Child in May of 2019. Prior to trial, the GAL issued a four-page report, which included a recommendation in favor of relocation. *See* Report of Sherwood P. Grabiec, Guardian Ad Litem for L.G., A Minor, 5/10/2019.

Notably, during Mother's case-in-chief at trial, the GAL testified that it was "very difficult" for him to make a recommendation in case but he "would have to give a certain amount of greater weight to the opportunities that may be available to [Child] in the Boston area." N.T., 6/27/2019, at 156. Additionally, he stated:

> I want to stress that I'm not a parenting coordinator. I'm not a custody evaluator. I don't have the expertise in that field…. But again, I guess at the end of the day, I thought both parents were capable, caring. But if you have to point the finger at one or more factors, the opportunities probably in Boston are greater.

*Id.*, at 156-157.

During Father's case-in-chief, the GAL testified: "So at the end of the day, I guess I don't have the wisdom of Solomon to say … what will – would be ultimately in the best interest of [Child]." N.T., 12/23/2019, at 7.

Moreover, when asked by the court if he could provide his opinion regarding the best interest of Child, the GAL stated:

> I haven't seen anything to cause me great concern or concern that [Child] is struggling with a difficult situation. His parents live separately and apart.
>
> Now, you know, he has been functioning and living in the Greater Boston area for a number of years. He doesn't seem as though he's in great distress over that. He's had the ability to enjoy a lot of experiences with his father. I would imagine that would continue. Maybe modifications would have to be made.
>
> He is by all accounts in my estimation getting by really well … under the current situation. I would imagine he's going to have a lot of – would have a lot of great experiences, you know, maybe out of the Boston area.
>
> I guess I'm hard pressed to ultimately say what's going to be the preferable situation. You've heard from the experts who, you know, offered their opinions, and I wouldn't presume to necessarily have that level of expertise.

*Id.*, at 13-14.

Based on the record, it is evident that the trial court did not ignore the GAL's recommendation. However, it is also clear the GAL was not firm in his opinion regarding the best interest of Child as to relocation. After review, we are satisfied that the trial court properly considered and weighed the evidence presented by the GAL, and committed no abuse of discretion in reaching its decision even though it was contrary to the GAL's position. As noted above,

the court was not bound by the GAL's recommendation. Accordingly, Mother's fifth issue is unavailing.

As for Mother's sixth and seventh arguments, she addressed them together. Mother complains that the court erred and abused its discretion by allowing Dr. Evans-Barton to testify as an expert in the field of fatherless children and in recognizing the field of fatherless children as an accepted field of expertise. *See* Appellant's Brief, at 56. She states that Dr. Evans-Barton "does not have any specialized expertise that relates to the current case." *Id.*, at 57. Moreover, she states:

> Father presented no evidence to demonstrate that Dr. Evans-Barton possessed any scientific, technical or other specialized knowledge with regard to relocation in child custody cases. In providing her purported expert testimony, Dr. Evans–Barton references her own personal experience and studies out there to form her opinions which were based on her anecdotal interactions with children she has counseled. She also admitted that it was not her research which she was relying on to form her opinion but rather the research of others despite her failure to cite to any of the research she relied on. Therefore, there was no basis for which the court could conclude that she possessed knowledge beyond that possessed by others, nor that her methodology was generally accepted.

*Id.*, at 58 (citations to the reproduced record and quotation marks omitted). Additionally, Mother claims Dr. Evans-Barton's experience focused on reuniting children with their fathers when they had been separated for numerous reasons and here, those circumstances do not apply because Child "has and will continue to have a relationship with his father." *Id.*, at 58.

When reviewing evidentiary rulings by the trial court, our standard of review is narrow. *See Potochnick v. Perry*, 861 A.2d 277, 282 (Pa. Super. 2004). The admission of expert testimony is within the discretion of the trial court and should not be disturbed on appeal unless the trial court abuses its discretion. *See Buttaccio v. American Premier Underwriters, Inc.*, 175 A.3d 311, 315 (Pa. Super. 2017).

The admissibility of expert testimony is governed by Rule 702 of the Pennsylvania Rules of Evidence. Under Rule 702, an expert may testify if she has scientific, technical or other specialized knowledge, beyond that of a layperson, which will assist the trier of fact to understand the evidence or to determine a fact in issue. *See* Pa.R.E. 702.

It is well established in Pennsylvania that the standard for qualification of an expert witness is a liberal one. *See Miller v. Brass Rail Tavern*, 664 A.2d 525, 528 (Pa. 1995). The test to be applied when qualifying a witness "is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation." *Id.* The witness normally need only possess more expertise than is otherwise within the ordinary range of training, knowledge, intelligence or experience. *See id.* If she does, she may testify and the weight of such testimony is for the trier of fact to determine in view of the expert's credentials. *See id.*

Regarding her credentials, Dr. Evans-Barton received her bachelor's degree at the University of Michigan in chemistry, a master's degree at Emory

University in bio-chemistry cell development, and a philosophy degree at CICA University in theological seminary. She is an ordained minister with a certification in divorce and family reunification mediation, and is also a cognitive behavioral life coach and practitioner. She has provided an opinion on the study of fatherless children vis-à-vis relocation in a custody matter in one other occasion. *See* N.T., 8/23/2019, at 128-131.

Dr. Evans-Barton is the CEO of The Fatherless Generation Foundation, which is an organization that "specializes in reunification of fatherless children with their biological fathers." *Id.*, at 128. She has worked with over 55,000 children who have grown up in fatherless homes from the ages of 7 to 19. *Id.*, at 129. Dr. Evans-Barton testified that she has utilized the definition of a "fatherless child" as defined by the National Fatherhood Initiative, which has four factors: (1) a child who has never met the father; (2) a child who has limited access to the father; (3) a child whose father has died; and (4) a child who has a father in the home but is emotionally detached or has no attachment to that particular father. *Id.*, at 128. When asked about the present matter, she stated Child fell under the Factor 2 definition – a child who had limited access to his father. *Id.*, at 129.

Dr. Evans-Barton explained her recommendation of non-relocation based on her expertise by analyzing each of the Section 5337 relocation factors, emphasizing the stressors a child faces when his parents are not in close residential proximity. *Id.*, at 132-137.

We reiterate that the trial court is permitted to apply a liberal standard for qualification of an expert witness. *See Miller*, 664 A.2d at 528. Based on the foregoing, Mother has not demonstrated that the trial court abused its discretion in permitting Dr. Evans-Barton to testify as an expert witness.

Moreover, we note that while the trial court permitted Dr. Evans-Barton to testify as an expert in the field of fatherlessness, we can find no instance where the court explicitly relied on her testimony in its relocation determination. As evidenced by its March 5, 2020, opinion, the court summarized Dr. Evan-Barton's testimony in its synopsis, but its analysis and conclusion focused on the testimony of Mother, Father, the GAL, and her expert witness, Dr. Lewis. *See* Trial Court Opinion, at 33-42. Accordingly, Mother's sixth and seventh assertions fail.

Lastly, Mother sets forth a conclusory argument that based on all of her prior assertions, "the trial court failed to acknowledge the weight of the evidence favored granting [her] request for relocation when the evidence was applied to the factors set forth" in Section 5337(h). Appellant's Brief, at 59.

As discussed several times above, the trial court properly addressed the ten relocation factors and made reasonable findings of fact based on the evidence presented at trial. We are bound by the findings. *See A.D.*, 989 A.2d at 35-36. Accordingly, Mother's final claim is unavailing.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/15/2020</u>